**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
50 Main Street, Suite 475
White Plains, NY 10106
Telephone: (914) 874-0710
Facsimile: (914) 206-3656
E-mail: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Stefan Bogdanovich (State Bar No. 324525)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: sbogdanovich@bursor.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ELENA NACARINO, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>WYNN RESORTS HOLDINGS, LLC,<br><br>Defendant. | Case No. 3:26-cv-03963-WHO<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**<br><br>Date: November 18, 2026<br>Time: 2:00 p.m.<br>Place: Courtroom 2, 17th Floor<br>Before: Hon. William H. Orrick |

## TABLE OF CONTENTS

PAGE(S)


INTRODUCTION ..... 1

ARGUMENT ..... 2

I. PLAINTIFF HAS ARTICLE III STANDING ..... 2

II. THIS COURT HAS PERSONAL JURISDICTION OVER DEFENDANT ..... 6

III. PLAINTIFF DID NOT CONSENT TO THE THIRD PARTIES' WIRETAPPING ..... 8

A. CIPA § 631(a) Requires Prior Consent And Wynn Never Obtained It ..... 8

B. A Reasonable User Reading Wynn's Policies Would Not Necessarily Understand That Wynn Would Disclose Their Guest Records With Third-Parties. ..... 9

IV. PLAINTIFF SUFFICIENTLY ALLEGES A VIOLATION OF CIPA § 631 ..... 12

A. By Compiling and Organizing Plaintiff's Responses From Multiple Screens In Real-Time, The Third-Parties Were Reading Or Learning What Was Being Said While It Was "In Transit" ..... 12

B. Plaintiff Alleges that Snap, Google, and Meta "Read or Attempted to Read" the "Contents" of Her Electronic Communications ..... 14

C. Plaintiff Alleges that Wynn "Aided, Agreed With, Employed, Or Conspired With" the Third Parties in Violation of the Fourth Prong of CIPA § 631(a) ..... 16

D. Plaintiff Need Not Plead The Third Parties' Intent to Collect Guest Records—And Has Alleged Sufficient Intent Regardless ..... 17

V. THE COMMUNICATIONS AT ISSUE ARE CONFIDENTIAL AND PLAINTIFF SUFFICIENTLY ALLEGES A VIOLATION OF CIPA § 632 ..... 19

VI. PLAINTIFF STATES CLAIMS UNDER THE ECPA ..... 21

A. Defendant Unlawfully Procured The Third Parties to Intercept the Communications at Issue ..... 21

B. The Crime-Tort Exception to the Federal Wiretap Act's One-Party Consent Exemption Applies ..... 22

CONCLUSION ..... 25

## TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Barker Bros. v. City of Los Angeles*,
10 Cal. 2d 603 (1938) .......... 16

*Barnhart v. Sigmon Coal Co.*,
534 U.S. 438 (2002) .......... 21

*Barrales et al. v. Reckitt Benckiser LLC*,
2026 WL 2212867 (N.D. Cal. July 31, 2026) .......... 7, 8

*Bernstein v. Virgin Am., Inc.*,
227 F. Supp. 3d 1049 (N.D. Cal. 2017) .......... 6

*Boseovski v. McCloud Healthcare Clinic, Inc.*,
2020 WL 68578 (E.D. Cal. Jan. 7, 2020) .......... 22

*Briskin v. Shopify, Inc.*,
135 F.4th 739 (9th Cir. 2025) .......... 6, 7

*Calhoun v. Google, LLC*,
113 F.4th 1141 (9th Cir. 2024) .......... 11, 12

*Campbell v. Facebook, Inc.*,
77 F. Supp. 3d 836 (N.D. Cal. 2014) .......... 20

*Correia v. Lulu & Georgia, Inc.*,
2026 WL 2343093 (S.D. Cal. Aug. 12, 2026) .......... 13

*Cousin v. Sharp Healthcare*,
681 F. Supp. 3d 1117 (S.D. Cal. 2023) .......... 16

*Crano v. Sojern, Inc.*,
2026 WL 1670136 (N.D. Cal. June 9, 2026) .......... 4, 5

*D'Angelo v. Penny OpCo, LLC*,
2023 WL 7006793 (S.D. Cal. Oct. 24, 2023) .......... 13

*Dawson v. Univ. of Phoenix*,
2026 WL 92248 (N.D. Ill. Jan. 13, 2026) .......... 22

*Dellasala v. Samba TV, Inc.*,
2026 WL 1138358 (N.D. Cal. Apr. 21, 2026) .......... 24

*Doe I v. Google LLC*,
2025 WL 1616720 (N.D. Cal. June 6, 2025) .......... 15

*Doe I v. Google LLC*,
741 F. Supp. 3d 828 (N.D. Cal. 2024) ..... 18

*Doe v. Eating Recovery Ctr., LLC*,
806 F. Supp. 3d 1109 (N.D. Cal. 2025) ..... 13, 15

*Doe v. Meta Platforms, Inc.*,
690 F. Supp. 3d 1064 (N.D. Cal. 2023) ..... 18

*Doe v. Tenet Healthcare Corp.*,
789 F. Supp. 3d 814 (E.D. Cal. 2025) ..... 13, 16

*Dole Food Co. v. Watts*,
303 F.3d 1104 (9th Cir. 2002) ..... 7

*E.H. & V.P. v. Lifelong Adoptions, Inc.*,
2026 WL 2138062 (E.D. Cal. July 24, 2026) ..... 23

*Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) ..... 2

*Frasco v. Flo Health, Inc.*,
2025 WL 1476905 (N.D. Cal. May 22, 2025) ..... 13

*Freeman v. DirecTV, Inc.*,
457 F.3d 1001 (9th Cir. 2006) ..... 22

*Gabrielli v. Haleon US Inc.*,
815 F. Supp. 3d 852 (N.D. Cal. 2025) ..... passim

*Gaige v. Exer Holding Co.*,
2025 WL 559719 (C.D. Cal. Jan. 30, 2025) ..... 23

*Garcia v. Truist Fin. Corp.*,
825 F. Supp. 3d 1149 (C.D. Cal. 2026) ..... 23

*Gianne v. Accor Mgmt. US Inc.*,
2026 WL 925522 (C.D. Cal. Mar. 31, 2026) ..... 2, 3, 19, 20

*Gilligan v. Experian Data Corp.*,
2026 WL 32259 (N.D. Cal. Jan. 6, 2026) ..... 24

*In re Google Inc. Cookie Placement Consumer Priv. Litig.*,
806 F.3d 125 (3rd Cir. 2015) ..... 16

*In re Meta Pixel Healthcare Litig.*,
647 F. Supp. 3d 778 (N.D. Cal. 2022) ..... passim

*In re Meta Pixel Tax Filing Cases*,
724 F. Supp. 3d 987 (N.D. Cal. 2024) ..... 16

*In re Zynga Priv. Litig.*,
750 F.3d 1098 (9th Cir. 2014) ........ 14

*Jackson v. LinkedIn Corp.*,
744 F. Supp. 3d 986 (N.D. Cal. 2024) ........ 12

*Javier v. Assurance IQ, LLC*,
2022 WL 1744107 (9th Cir. May 31, 2022) ........ 8, 9

*Javier v. Assurance IQ, LLC*,
649 F. Supp. 3d 891 (N.D. Cal. 2023) ........ 17, 18

*K.L. v. Legacy Health*,
2024 WL 4794657 (D. Or. Nov. 14, 2024) ........ 24

*Katz-Lacabe v. Oracle Am., Inc.*,
2024 WL 1471299 (N.D. Cal. Apr. 3, 2024) ........ 25

*Kauffman v. Papa John's Int'l, Inc.*,
2024 WL 171363 (S.D. Cal. Jan. 12, 2024) ........ 8

*King v. Hard Rock Cafe Int'l (USA), Inc.*,
2025 WL 1635419 (E.D. Cal. June 9, 2025) ........ 15

*Krzyzek v. OpenX Techs., Inc.*,
817 F. Supp. 3d 857 (N.D. Cal. 2026) ........ 24

*Lonegan v. Hasty*,
436 F. Supp. 2d 419 (E.D.N.Y. 2006) ........ 22

*Lynch v. Express Scripts Holding Co.*,
2026 WL 1749550 (N.D. Cal. June 17, 2026) ........ 24

*Mattel, Inc. v. Greiner & Hausser GmbH*,
354 F.3d 857 (9th Cir. 2003) ........ 7

*Mikulsky v. Bloomingdale's, LLC*,
2024 WL 3091395 (S.D. Cal. May 14, 2024) ........ 15

*Mikulsky v. Bloomingdale's, LLC*,
2025 WL 1718225 (9th Cir. June 20, 2025) ........ 7

*Mikulsky v. Bloomingdale's, LLC*,
713 F. Supp. 3d 833 (S.D. Cal. 2024) ........ 15

*Mitchell v. Sonesta Int'l Hotels Corp.*,
2024 WL 4471772 (C.D. Cal. Oct. 4, 2024) ........ 2, 19

*Nichols v. Peacehealth Networks on Demand LLC*,
2026 WL 607763 (W.D. Wash. Mar. 4, 2026) ........ 22

*Peavy v. WFAA-TV, Inc.*,
221 F.3d 158 (5th Cir. 2000) .......... 22

*Planned Parenthood Fed'n of Am., Inc. v. Newman*,
51 F.4th 1125 (9th Cir. 2022) .......... 23

*Popa v. Microsoft Corp.*,
153 F.4th 784 (9th Cir. 2025) .......... 2, 3, 4, 5

*Q.J. v. PowerSchool Holdings LLC*,
2025 WL 2410472 (N.D. Ill. Aug. 20, 2025) .......... 22

*R.C. v. Walgreen Co.*,
733 F. Supp. 3d 876 (C.D. Cal. 2024) .......... 24

*R.S. v. Prime Healthcare Servs., Inc.*,
2025 WL 103488 (C.D. Cal. Jan. 13, 2025) .......... 23

*Ribas v. Clark*,
696 P.2d 637 (Cal. 1985) .......... 17

*Riganian v. LiveRamp Holdings, Inc.*,
791 F. Supp. 3d 1075 (N.D. Cal. 2025) .......... 13, 14, 24

*Rodriguez v. Aquatic Sales Sols. LLC*,
735 F. Supp. 3d 1208 (C.D. Cal. 2024) .......... 13

*Rodriguez v. Google LLC*,
2021 WL 2026726 (N.D. Cal. May 21, 2021) .......... 20, 25

*Semien v. PubMatic Inc.*,
2026 WL 216333 (N.D. Cal. Jan. 27, 2026) .......... 24, 25

*Shah v. Hilton Worldwide Holdings, Inc.*,
2025 WL 1683577 (N.D. Cal. June 11, 2025) .......... 8

*Smith v. Rack Room Shoes, Inc.*,
2025 WL 2210002 (N.D. Cal. Aug. 4, 2025) .......... 23, 24

*Snyder v. G6 Hosp. LLC*,
2025 WL 1254382 (C.D. Cal. Apr. 14, 2025) .......... 6

*So v. Hyatt Hotels Corp.*,
2026 WL 1235036 (N.D. Ill. May 5, 2026) .......... 6

*St. Aubin v. Carbon Health Techs., Inc.*,
2024 WL 4369675 (N.D. Cal. Oct. 1, 2024) .......... 13, 16

*Sussman v. ABC, Inc.*,
186 F.3d 1200 (9th Cir. 1999) .......... 22

*Tate v. VITAS Healthcare Corp.*,
762 F. Supp. 3d 949 (E.D. Cal. 2025) .......... 16, 17

*Thomas v. Papa John's Int'l, Inc.*,
2025 WL 1704437 (9th Cir. June 18, 2025) .......... 7

*Torres v. Prudential Fin., Inc.*,
2025 WL 1135088 (N.D. Cal. Apr. 17, 2025) .......... 13

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 2

*Wilson v. Google LLC*,
2025 WL 901941 (N.D. Cal. Mar. 25, 2025) .......... 18

*Yoon v. Meta Platforms, Inc.*,
2024 WL 5264041 (N.D. Cal. Dec. 30, 2024) .......... 20, 21

*Zarif v. Hwareh.com, Inc.*,
789 F. Supp. 3d 880 (S.D. Cal. 2025) .......... 17

**STATUTES**

18 U.S.C. § 2511 .......... 21, 22

18 U.S.C. § 2702 .......... 22

18 U.S.C. § 2707 .......... 22

Cal. Civ. Code § 53.5 .......... passim

Cal. Pen. Code § 631(a) .......... 16, 18

## INTRODUCTION

Wynn embedded Snap's, Google's, and Meta's tracking code on its hotel booking website so that every communication a guest makes while reserving a room—*which* dates, *which* room, *how* many guests, at *what* rate, and under *what* name, email address, and phone number, along with *what* reservation number—is duplicated, routed, and read by three advertising companies in real time, before the guest is ever told. ECF No. 1 ("Compl.") ¶¶ 1-7, 41-42, 77-78; *see also id.* ¶¶ 58-62, 79-87 (regarding Snap), 63-69, 88-98 (Google), 70-76, 99-116 (Meta). California law calls that information a "guest record" and forbids hotelkeepers, like Wynn, from sharing it. Cal. Civ. Code § 53.5. Wynn's motion to dismiss does not deny the conduct; it argues that no one may complain of it. ECF No. 25 ("MTD"). Each argument fails.

Plaintiff has Article III standing because the covert redirection of her confidential guest records to unannounced tech giants who train their software on her data is closely analogous to the privacy torts American courts have always recognized (§ I). This Court has personal jurisdiction because Wynn chose to operate an interactive site that will not book a room until a user enters her California address, and chose to forward that data to three California companies (§ II). Wynn obtained no consent: the interceptions were complete before any checkbox appeared, the checkbox named only "terms & conditions," and the policies Wynn invokes promise the opposite of what it did (§ III). Plaintiff states a claim under CIPA § 631 because the Third Parties read her communications in transit—assembling her clicks and data entries across various screens into single, real-time transmissions—and Wynn aided, agreed with, employed, and conspired with them by installing and configuring the code itself (§ IV). Plaintiff's communications are confidential, as two courts have already held in near-identical "guest record" CIPA cases (§ V). And Plaintiff states her ECPA claims because the one-party consent exemption does not reach procurement, and because the crime-tort exception applies where the object of the design was the very disclosure § 53.5 prohibits (§ VI). Wynn's motion should be denied in full.

## ARGUMENT

### I. PLAINTIFF HAS ARTICLE III STANDING

Plaintiff  has Article III standing to bring this case because she alleges her sensitive hotel guest records were disclosed. Wynn shared the details of her Vegas trip to various third-party tech companies. Plaintiff had an expectation of privacy in that information. "What happens in Vegas [is supposed to] stay[] in Vegas." Compl. ¶ 1. "Indeed, it is a reasonable inference from an objective perspective that a person reasonably expects details regarding where she is traveling, including the number of guests, destination, and number of rooms, would remain confined to the parties." *Gianne v. Accor Mgmt. US Inc.*, 2026 WL 925522, at *8 (C.D. Cal. Mar. 31, 2026). And "[c]onsidering California Civil Code section 53.5(a) is designed to protect guest records from disclosure, this bolsters Plaintiff's claim that the communications are confidential." *Id.*; *accord Mitchell v. Sonesta Int'l Hotels Corp.*, 2024 WL 4471772, at *11 (C.D. Cal. Oct. 4, 2024), *adopted as modified*, 2024 WL 4474491 (C.D. Cal. Oct. 4, 2024).

This is not a novel proposition. This Court already held that another plaintiff in a similar web tracking case had Article III standing where a defendant disclosed his browsing information on a website "involv[ing] healthcare." *Gabrielli v. Haleon US Inc.*, 815 F. Supp. 3d 852, 867 (N.D. Cal. 2025). So too here, the disclosure of Plaintiff's confidential guest records maps onto "concrete" and "intangible harms"—including "disclosure of private information, and intrusion upon seclusion"—which *TransUnion LLC v. Ramirez* identified among the "harms traditionally recognized as providing a basis for lawsuits in American courts." 594 U.S. 413, 425 (2021).

The "historically recognized right to privacy" confers "standing to pursue [] privacy claims under … CIPA[.]" *In re Facebook, Inc. Internet Tracking Litig.* ("*In re Facebook*"), 956 F.3d 589, 599 (9th Cir. 2020). The Ninth Circuit "has not disavowed *Facebook* in the wake of *TransUnion*," and statutes like CIPA "codify a substantive right to privacy, the violation of which gives rise to a concrete injury sufficient to confer standing." *Gabrielli*, 815 F. Supp. 3rd at 864 (cleaned up).

Wynn argues that *Popa v. Microsoft Corp.*, 153 F.4th 784, 791 (9th Cir. 2025) precludes standing. MTD at 8. It does not. *Popa* expressly noted that Article III standing would exist for web tracking claims "in particular circumstances" such as the disclosure of "sensitive medical or financial

information." *Id*. "But Popa identifies no … private information collected." *Id*. Instead, "[a]t most, Popa alleges that Clarity gathered her pet-store preferences and her street name." *Id*. That is not the case here. Here, Plaintiff alleges Snap, Google, and Meta discovered which room she booked at the Wynn, on which date, at what rate, how many guests she had, along with her name, email address, and phone number, along with her specific reservation number. *See* Compl. ¶¶ 5-8; *see also id.* ¶¶ 58-62, 79-87 (regarding Snap), 63-69, 88-98 (Google), 70-76, 99-116 (Meta). Again, "a person reasonably expects details regarding where she is traveling, including the number of guests, destination, and number of rooms, would remain confined to the parties." *Gianne*, 2026 WL 925522, at *8.

Wynn's rejoinder—that "[t]he legislature cannot manufacture Article III harms" (MTD at 1)—mistakes the work § 53.5 does here. The harm here is not a violation of the guest records statute; § 53.5 does not provide a private right of action and plaintiff does not bring a claim under it. Instead, the harm here is the same one that has existed under the common law: the disclosure of private information. Section 53.5 simply supplies the objective standard on which we can judge whether the information disclosed here is private. Indeed, this Court reached the same conclusion in *In re Meta Pixel Healthcare Litig*., 647 F. Supp. 3d 778 (N.D. Cal. 2022). There, this Court relied on the fact that "medical-related communications between patients and their medical providers *are protected by federal law*" to "show[] that there is something unique about these particular internet communications which justify departing from the presumption" of non-confidentiality. *Id*. at 799 (emphasis added).

Second, the "[t]he tracking technologies" in *Popa* "are also distinguishable, both in users' interactions with them and their capabilities." *Gabrielli*, 815 F. Supp. 3d at 867.

> [T]he session-replay technology [in *Popa*] was not alleged to track anything beyond her interactions with the website she chose to visit, and the information gathered was only alleged to be used by the owner of that website. In contrast, Gabrielli alleges that the cookies Haleon stores on users' devices allow third parties "to track and collect data in real time regarding ... user input data," which includes "[t]he information the user entered into the Websites' form fields, including search queries, the user's name, age, gender, email address, location, and/or payment information, demographic information," and also "device information, session information, and/or geolocation data."

*Id.* (internal citation omitted).

Here, Snap, Google, and Meta each "contemporaneously intercept[ed]" the communications at issue. Compl. ¶¶ 58, 63, 70. The Complaint alleges that all three third parties used the intercepted communications not only to provide Wynn "analytics, marketing, and advertising services," but also "*for their own business purposes*." *Id.* ¶ 188 (emphasis added). Moreover, the tracking technologies here go beyond recording a user's interactions with the single website she chose to visit. For instance, the Snap Pixel collects "user parameter[s]" for "PII matching" (*id.* ¶¶ 85-86), and its "[p]ersistent" cookies "track user behavior *across different sites*." *Id.* ¶ 78 (cleaned up) (emphasis added). This case, as in *Gabrielli*, also concerns form fields. Meta "intercepts users' names, email address, phone numbers, and/or other personal details using the Meta Pixel" that are entered on forms. *Id.* ¶ 115.

For this same reason, Wynn's argument that the information "transmitted by Wynn's website does not 'identify' the guest making the reservation" is false. MTD at 10; *see also id.* at 5 (claiming that hashed data is "gibberish"). Snap "simply match[es]" Plaintiff's "hashed email addresses and phone numbers collected from Website users with corresponding, non-hashed data associated with those users' Snapchat accounts." Compl. ¶ 87. This is critical. The FTC has twice warned that "[h]ashes aren't 'anonymous' and can still be used to identify users." *Id.* ¶ 115 n. 98. Nor does identification depend on "hashed" form-field data alone; when a logged-in user books a Wynn stay, her browser is *compelled* to transmit Snap's sc-a-nonce, sc_at, amd X-AB cookies (*id.* ¶ 80); Google's _Secure-3PAPISID; _Secure-3PSID; _Secure- 3PSIDCC; _Secure-3PSIDTS; _Secure-3PSIDRTS; NID; _ga; _gcl_au; and IDE cookies (*id.* ¶ 89); and Meta's c_user; _datr; fr; ps_n; sb; xs; and _fbp cookies (*id.* ¶ 101).

**<u>None of Defendant's cited cases hold otherwise.</u>** As noted, *Popa* acknowledged that the disclosure of "sensitive medical or financial information" or similarly legally protected categories of information online would still confer standing. 153 F.4th at 791.

Wynn also relies on *Crano v. Sojern, Inc.*, 2026 WL 1670136 (N.D. Cal. June 9, 2026) (MTD at 9), but that case never held that hotel-booking data is categorically outside Article III. Instead, *Crano* dismissed a complaint with leave to amend precisely because "it is not clear Plaintiff could not amend her complaint to plead an injury personal to herself[.]" *Id.* at *6. *Crano* turned entirely on

three pleading gaps that the Complaint here fills. The first "[c]ritical[]" defect in *Crano* was that the complaint did not allege the third party "actually collected Plaintiff's *personal* information"; the third party obtained "unique identifying numbers," such as a "cookie ID, ... IP address" etc.—which the court held "akin to the information *Popa* held did not give rise to a concrete privacy interest." *Crano*, 2026 WL 1670136, at *3. That places *Crano* squarely within the "IP address" line of cases this Court already distinguished. *See Gabrielli*, 815 F. Supp. 3d at 865 (authority "distinguishable, largely because the cases it cites involved allegations of disclosed IP addresses, in which there is no privacy interest"). Here, Plaintiff does not allege the interception of bare identifiers; she alleges that Wynn deliberately configured the Third Parties' trackers to scrape her personal information out of the Website's form fields—for instance, going into its Meta Events Manager and "one by one, 'toggl[ing] ON' email, first name, last name, Phone Number, Gender, Zip Code, City, and State." Compl. ¶ 114. Cal. Civil Code § 53.5 explicitly says that "'Guest record'" includes "name" and "telephone number."

The second defect in *Crano* was that the third party, Sojern, only "us[es] the data to improve its ability to market its clients' products," and thus Sojern was "no different than the session-replay technology at issue in *Popa*." 2026 WL 1670136, at *4. Here, the Third Parties, by their own terms, hold an independent right to deploy the data across their own platforms. Compl. ¶¶ 117-21, 186.

Third, *Crano* failed because the plaintiff never tied that capability to herself: the pleadings contained "a single paragraph of allegations as to Plaintiff" with "no allegations it employed her data as part of its marketing enterprise." 2026 WL 1670136, at *4. Plaintiff here, by contrast, alleges she "has a Facebook account, a Gmail account, and a Snapchat account," that she visited the Website "on the same browser that she used to access Facebook and Gmail," and that she "booked a Wynn Las Vegas stay." Compl. ¶¶ 5-7. The Complaint then reproduces the Website's actual network transmissions, evincing that the Third Parties' identity-pairing technologies fire and actually do pair confidential communications with the user's PII. Compl. ¶¶ 58-62, 79-87 (regarding Snap), 63-69, 88-98 (Google), 70-76, 99-116 (Meta).

*Crano* is further inapposite because the defendant, Sojern, was not a hotelkeeper but a "data business." *Crano*, 2026 WL 1670136, at *4 (cleaned up). Section 53.5(a) reaches an "innkeeper,

hotelkeeper, ... or owner or operator of an inn, hotel[.]" Here, Wynn is a hotelkeeper.

For this reason, Wynn misplaces its reliance on *Snyder*, where the defendant did not "convey[] anything else specified in the statute's list of guest records." *Snyder v. G6 Hosp. LLC*, 2025 WL 1254382, at *4 (C.D. Cal. Apr. 14, 2025). Wynn also relies on *So v. Hyatt Hotels Corp.*, 2026 WL 1235036 (N.D. Ill. May 5, 2026), but that court did "not definitively decide whether So's allegations would suffice under the California guest record statute[.]" *Id.* at *4.

Finally, Wynn suggests that because it operates in Nevada and not California, Plaintiff cannot apply Section 53.5. MTD at 10 n.3. Not so. "To determine whether a state law is being applied extraterritorially, courts consider whether the conduct *which gives rise to liability* ... occurs in California.'" *Bernstein v. Virgin Am., Inc.*, 227 F. Supp. 3d 1049, 1063 (N.D. Cal. 2017) (cleaned up), *aff'd*, 3 F.4th 1127 (9th Cir. 2021). Here it does. This case is about Wynn sharing information about Californians to other Californians. Plaintiff and Class members are all Californians, and their private guest records were all disclosed to Meta, Snap, and Google—companies all headquartered in California. Compl. ¶¶ 5-7, 141.

## II. THIS COURT HAS PERSONAL JURISDICTION OVER DEFENDANT

Wynn argues the Court lacks specific personal jurisdiction and that Plaintiff "fail[s] to show that Wynn expressly targeted Californians." MTD at 12. This is nonsense. Again, Wynn shared information about Californians to other Californian tech companies, so Wynn could send these Californians targeted advertisements.

In advancing this argument, Wynn resorts to misrepresenting the holding of *Briskin v. Shopify, Inc.*, 135 F.4th 739 (9th Cir. 2025) (en banc). First things first, the en banc panel in *Briskin* held California had personal jurisdiction over a Canada corporation that tracked Californians online. Wynn contends "the plaintiff in *Briskin* alleged both that the defendant targeted a California consumer and then used the consumer's data to further target businesses in California." MTD at 12. But that observation simply describes the *Briskin* record; it does not add an element. **The *Briskin* panel actually held exactly the opposite**: "requiring differential targeting would have the perverse effect of allowing a corporation to direct its activities toward all 50 states yet to escape specific personal jurisdiction in each of those states." 135 F.4th at 758.

The Ninth Circuit has twice applied *Briskin* without any such requirement, **and in doing so has twice rejected the argument Wynn makes here**. In *Thomas v. Papa John's Int'l, Inc.*, 2025 WL 1704437, at *1 (9th Cir. June 18, 2025), the court affirmed the denial of an out-of-state defendant's motion to dismiss for lack of personal jurisdiction. "[W]e reject Papa John's argument that it did not expressly aim its conduct at California" "[b]ecause Papa John's operates an interactive website with national viewership and scope that appeals to, and profits from, an audience in California," and allegedly "uses its website to intentionally collect information that invades the privacy of users, knowing that any alleged harm will be suffered in California[.]" *Id.* (cleaned up); *see also Mikulsky v. Bloomingdale's, LLC*, 2025 WL 1718225, at *1 (9th Cir. June 20, 2025) (same, for online retailer). Neither case involved any allegation that the defendant marketed consumer profiles to California businesses.

Here, Wynn knew that Plaintiff was a Californian, and its own materials prove it. Website users cannot reserve a room without entering their address. *See* Compl. ¶ 40 (Website "Screen 5"). Unless directly controverted, the Court must take all allegations in the plaintiff's complaint as true. *Dole Food Co. v. Watts*, 303 F.3d 1104, 1108 (9th Cir. 2002); *Mattel, Inc. v. Greiner & Hausser GmbH*, 354 F.3d 857, 862 (9th Cir. 2003). Wynn cites the same page, uncropped. *See* Exhibit A to Arun Tanpanuwat Declaration, ECF No. 22-1.

Wynn *chose* to embed the Third Parties' code on the Website, including on the checkout and confirmation pages, and *chose* to enable the matching features that forward users' contact details, IP addresses, city, state, and ZIP code to Snap, Google, and Meta. Compl. ¶¶ 41, 79-87 (regarding Snap), 63-69, 88-98 (Google), 70-76, 99-116 (Meta). Wynn's declarations do not contradict that the third parties collect PII and hotel confirmations or reservation numbers for those California users who, *only after entering their California address*, "click 'Reserve Now' to reserve their room" and are subsequently "brought to a confirmation page with their 'Confirmation Number.'" *Id.* ¶ 40. Wynn's California contacts were "its own choice and not random, isolated, or fortuitous." *Briskin*, 135 F.4th at 758 (cleaned up).

Far less has sufficed for personal jurisdiction. In *Barrales et al. v. Reckitt Benckiser LLC*, 2026 WL 2212867, at *7 (N.D. Cal. July 31, 2026), a Delaware LLC headquartered in New Jersey

was subject to personal jurisdiction even where "products cannot be purchased on the websites." The *Barrales* court noted that the sites were "interactive in that they elicit an election from the user," and "the websites detect that a user is in California." *Id.* Wynn's site does far more: it takes Plaintiff's name, phone, email, billing address, city, state, ZIP, and payment card, then issues a confirmation number, and Third Parties intercept all this information, including for California residents.

Wynn argues that "*Shah* is on point." MTD at 13. But *Shah v. Hilton Worldwide Holdings, Inc.*, 2025 WL 1683577, at *2 (N.D. Cal. June 11, 2025) was decided before *Thomas* and *Mikulsky*, and there were no allegations the defendant "collects data directly." *Id.* at *2. Here, Wynn itself collects data from Plaintiff: Wynn's own checkout form collects name, address, city, state, ZIP, phone, email, and card, and this data is "duplicated" and sent to the Third Parties. Compl. ¶¶ 40, 42.

In any event, Plaintiff's allegations satisfy Wynn's reading of *Briskin*. Wynn transmitted Californians' data to Snap, Google, and Meta, each headquartered in California, and received advertising, analytics, and audience-targeting services in return. The data Wynn took from California came to rest in California, and it purchased services from California companies to use the same. ECF No. 23-3 (Google in Mountain View); 23-4 (Meta in Menlo Park).

## III. PLAINTIFF DID NOT CONSENT TO THE THIRD PARTIES' WIRETAPPING

### A. CIPA § 631(a) Requires Prior Consent And Wynn Never Obtained It

Wynn never obtained Plaintiff's "express prior consent" before wiretapping her. In *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *2 (9th Cir. May 31, 2022), the Ninth Circuit held that, absent further word from the California Supreme Court, it "would interpret Section 631(a) to require the prior consent of all parties to a communication." Plaintiff alleges that she did not "provide [her] prior consent to" Wynn's conduct. Compl. ¶ 140; *id.* ¶ 4 (Wynn "failed to obtain consumers' consent before enabling the Third Parties to intercept their confidential hotel booking communications"). "This is sufficient to meet h[er] burden to plead that [s]he did not provide prior consent to the recording." *Kauffman v. Papa John's Int'l, Inc.*, 2024 WL 171363, at *6 (S.D. Cal. Jan. 12, 2024).

Wynn's own booking flow defeats prior consent. The checkbox that Wynn faults Plaintiff for having "omitted" (MTD at 15) appears only at the very last step of the checkout flow. *See* Tanpanuwat Decl., Ex. A; Compl. ¶ 40. But by then, Snap, Google, and Meta all already intercepted

dates, guest count, room selection, and checkout clicks across Screens 1 through 4. *See* Compl. ¶¶ 58-62, 63-69, 70-76. Those transmissions were complete before Plaintiff saw any checkbox, and so that checkbox cannot supply "prior consent" to communications already intercepted. *Javier*, 2022 WL 1744107, at *1-2.

**B. A Reasonable User Reading Wynn's Policies Would Not Necessarily Understand That Wynn Would Disclose Their Guest Records With Third-Parties.**

As this Court noted, "[i]n order for consent to be actual, the disclosures must explicitly notify users of the practice at issue." *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 793 (N.D. Cal. 2022) (cleaned up). As such, this Court held that Meta could not establish as a matter of law that plaintiffs consented to Meta's collection of sensitive medical information because its Privacy Policy only discussed "general internet browsing." *Id*. at 794. Here, in contrast, the problem is not only that Wynn's Privacy Policy is not specific enough; ***it is that Wynn did exactly what its Privacy Policy promised it wouldn't do***. Wynn's Privacy Policy "as it would have appeared as of May 18, 2025" (ECF No. 22 at 2) states:

> **We share** aggregated or **de-identified information with our marketing partners** to provide certain services or offers and to enhance your experience at Wynn. **This information cannot reasonably be used to identify you.**

ECF No. 22-3 at 11 (emphasis added).

We know that is not true because Wynn activated Meta's Advanced Matching. Compl. ¶¶ 29, 109-113. As Meta explains, when Advanced Matching is activated, its pixels "'look for recognizable form field and other sources on [the] website that contain information such as first name, last name and email address.'" *Id.* ¶ 109 (quoting META, ABOUT ADVANCED MATCHING FOR WEB, https://www.facebook.com/business/help/611774685654668).

In other words, when users making a Wynn reservation start filling out the Guest Information form fields, Meta collects the names, email addresses, and phone numbers they type in. *See id*. ¶ 40.




"As Meta explains, in order for this to have happened, Defendant would have had to 'Toggle ON the parameters you want to share from your website.'" *Id*. ¶ 113 (quoting META, SET UP AUTOMATIC ADVANCED MATCHING IN META EVENTS MANAGER, https://www.facebook.com/business/help/1993001664341800?id=1205376682832142). Meta tells companies: "We suggest selecting at least **Email** and **Phone number** for the best results." *Id*. ¶ 114 (image). And on Wynn's website, "Defendant configured the pixel to scan form fields containing a user's email address, first name, last name, phone number, gender, zip code, city and state." *Id*. ¶ 110; *see also id.* ¶ 114.

In other words, Wynn's documents thus did not merely fail to notify Plaintiff of the challenged conduct; *they promised the opposite.* Wynn promised users the data it would Meta "**cannot reasonably be used to identify you.**" ECF No. 22-3 at 11. Far from establishing Wynn's consent defense, this Privacy Policy shows Wynn broke a promise it made to consumers.

This is similar to the consent defense the Ninth Circuit rejected in *Calhoun v. Google, LLC*, 113 F.4th 1141, 1147 (9th Cir. 2024). In *Calhoun*, Google argued Chrome users consented to Google collecting their data in incognito mode when they agreed to Google's Privacy. *Id*. The Ninth Circuit also rejected a consent defense *at summary judgment* where defendant's Privacy Policy also said, "*You don't need to provide any personal information to use Chrome*." *Id.* at 1143 (emphasis in original). And the Ninth Circuit held that a reasonable user reading that sentence "could [understand] the 'personal information' the Chrome Privacy Notice addresses includes cookies and IP addresses," *id*. at 1148, which was, of course, the exact information Google ended up collecting in incognito mode.

Google nevertheless asserted various other readings of its own Privacy Policy which suggested the opposite. But the Ninth Circuit held the ambiguity was fatal to its consent defense. "If that user could have plausibly understood the disclosures 'as *not* disclosing that [the defendant] would engage in particular conduct,' then the disclosures are insufficient to establish consent." *Calhoun*, 113 F.4th at 1147 (citation omitted). In making this determination, it warned lower courts not to "ma[k]e the case turn on a technical distinction unfamiliar to most 'reasonable user[s],'" as the district court it reversed did. *Id*. at 1148. "Whether a 'reasonable' user of Google's computer software at issue in this case consented to a particular data collection practice is not to be determined by attributing to that user the skill of an experienced business lawyer or someone who is able to easily ferret through a labyrinth of legal jargon to understand what he or she is consenting to. Instead, a determination of what a 'reasonable' user would have understood must take into account the level of sophistication attributable to the general public, which uses Google's services." *Id*. at 1151.

So too here, a reasonable Wynn visitor could read Wynn's Privacy Policy's statement that the "information" it shares with its "[m]arketing [p]artners" **"**cannot reasonably be used to identify you," ECF No. 22-3 at 11, and reasonably understand it as meaning Wynn would not activate

Advanced Matching on its website. Because a Vegas tourist with "the level of sophistication attributable to the general public," *Calhoun*, 113 F.4th at 1151, might read that sentence and come away thinking Wynn promised not turn on Advanced Matching, its consent defense here must fail.

And more generally, even if there were no deception, Wynn fails to point to any language in its Policies which "explicitly notif[ies]" plaintiff that his hotel guest records would be disclosed. *In re Meta Pixel Healthcare*, 647 F. Supp. 3d at 793. Instead, Wynn's Policies refer to general internet browsing and fail to mention any particularly sensitive information would be disclosed. This is not enough. *See id.*

## IV. PLAINTIFF SUFFICIENTLY ALLEGES A VIOLATION OF CIPA § 631

### A. By Compiling and Organizing Plaintiff's Responses From Multiple Screens In Real-Time, The Third-Parties Were Reading Or Learning What Was Being Said While It Was "In Transit"

Wynn argues "Plaintiff does not allege that any Third Party *read* her communications while 'in transit.'" MTD at 18. This argument fails on multiple grounds.

**Plaintiff's Communications Were Read And Learned.** Plaintiff's "complaint contains a plethora of allegations that [each of the third parties] read and used the data it acquired from [Defendant's website] for its own marketing services." *Jackson v. LinkedIn Corp.*, 744 F. Supp. 3d 986, 994 (N.D. Cal. 2024). For example, Snap "helps 'optimize ad delivery'"; "create Custom Audiences that 'target users who have visited [a] site, completed specific actions, or engaged with [] ads"; and "create a type of Custom Audience called a Lookalike Audience, which seeks out people who … are similar to [a website's] best customers." Compl. ¶ 46. As for Google, the tracking technologies "compel that user's browser to transmit several Google cookies," including a "marketing cookie that '[p]rofiles the interests of website visitors to serve relevant and personalised ads through retargeting.'" *Id.* ¶¶ 89–90. And "the Meta Pixel can be used to help 'measure the effectiveness of … ads'; 'define custom audiences for ad targeting'; and support 'Advantage+ catalog ads campaigns.'" *Id.* ¶ 54.

**Plaintiff Need Not Allege They Were Read And Learned In Transit.** Wynn argues "any use of the data by the Third Parties only occurs—necessarily—after they have received it." MTD at 18. But Plaintiff clarifies that "[t]his entire process occurs within milliseconds" and the

"communications are simultaneously and contemporaneously duplicated[.]" Compl. ¶ 42. And "[c]ourts have held allegations of simultaneous duplication and interception of communications sufficient to plead 'interception' while 'in transit.'" *Doe v. Tenet Healthcare Corp.*, 789 F. Supp. 3d 814, 838 (E.D. Cal. 2025) (collecting cases); *Rodriguez v. Aquatic Sales Sols. LLC*, 735 F. Supp. 3d 1208, 1228 (C.D. Cal. 2024); *Correia v. Lulu & Georgia, Inc.*, --- F. Supp. 3d ----, 2026 WL 2343093, at *5 (S.D. Cal. Aug. 12, 2026).

"At the motion to dismiss stage, a plaintiff is not required to allege how and when their communications are captured," because that information "resides uniquely in the custody and control of the CIPA defendant and its third-party recorder." *St. Aubin v. Carbon Health Techs., Inc.*, 2024 WL 4369675, at *6 (N.D. Cal. Oct. 1, 2024); *D'Angelo v. Penny OpCo, LLC*, 2023 WL 7006793, at *8 (S.D. Cal. Oct. 24, 2023).

Nevertheless, Wynn points to *Torres v. Prudential Fin., Inc.*, 2025 WL 1135088 (N.D. Cal. Apr. 17, 2025) and *Doe v. Eating Recovery Ctr., LLC*, 806 F. Supp. 3d 1109 (N.D. Cal. 2025) to argue Plaintiff must allege the Third Parties "reads or attempts to read the contents of the communication while they are in transit." MTD at 18 (cleaned up). But both cases were decided at summary judgment, illustrating the impropriety of Wynn's Rule 12 arguments. *See id.*

Indeed, *Frasco v. Flo Health, Inc.*, 2025 WL 1476905, at *1 (N.D. Cal. May 22, 2025) also involved the Meta Pixel, but the court denied summary judgment on the issue of "whether Meta's interception occurred while the communications were 'in transit.'" *Riganian v. LiveRamp Holdings, Inc.*, 791 F. Supp. 3d 1075, 1092 (N.D. Cal. 2025) likewise observed that *Torres* illustrates "whether communications are 'read' in transit or only after storage is a fact-intensive question" dependent on "how the challenged technology and processes actually work—a question Torres decided only after a full evidentiary record at summary judgment."

**<u>Plaintiff Nevertheless *Does* Allege Her Communications Were Read And Learned In Transit.</u>** Regardless, the complaint alleges that those real-time transmissions actively combine what the user clicked over the course of several screens to make sense of the conversation that was occurring before them in real-time. For example, Snap receives one transmission combining the "button clicks on Website Screens 1A and 1B, and Screen 2" and summarizing that the user sought

a reservation from June 18 to June 19, 2026 for two adults in one room. Compl. ¶ 59. And at the final step of the checkout process on Screen 5, Snap combines the user's typed email address and phone number with the fact that she clicked "Reserve Now" and reached the "Order Confirmation | Wynn Las Vegas" page — summarizing, *in a single transmission*, both who was on the other end of the conversation and that it ended in a completed booking. *Id.* ¶ 62. The Google and Meta trackers operate in similar fashion. *See id.* ¶¶ 68-69, 75-76 (combining clicks across Screens).

In other words, by detailing how the third-parties "'connect[] all these identifying points of data into a single [transmission] … in real time,' Plaintiffs have set forth a specific factual theory as to how [the third parties] incorporate[]—and thus read[]—the intercepted content 'in real time.'" *Riganian*, 791 F. Supp. 3d at 1092.

### B. Plaintiff Alleges that Snap, Google, and Meta "Read or Attempted to Read" the "Contents" of Her Electronic Communications

Wynn argues "the Third Parties are not plausibly alleged to have intercepted the contents of any communication by Plaintiff." MTD at 18. Not so. Plaintiff's interactions with the Website qualify as the contents of communications because they convey an "intended message to another." *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014). Among other things, they told Wynn "which hotel[,] which rooms they will stay in, on which dates they come and on which dates they leave, along with how many guests they have with them," and if they "ask for an upgrade." Compl. ¶ 3.

The Complaint illustrates the typical conversation between Wynn and Plaintiff. *Id.* ¶¶ 36-40. Wynn opens by asking users to select "the dates for their trip, the number of rooms they require, and the number of guests per room who will be traveling," then presents "available pricings, offers, and/or rates" and asks them to "review and choose a particular room." *Id.* ¶¶ 36-38 (Screens 1A-3B). Users answer by clicking "VIEW ROOMS" at the "Flexible Getaway Rate," then "View Room Details" and "Book Now" as to a "WYNN PANORAMIC VIEW TWO QUEENS." *Id.* ¶¶ 37-38. Wynn next "asks users whether they wish to upgrade their room"—*i.e.*, to a "Wynn Panoramic Corner King"—and whether they want "Add-Ons" such as "Late Checkout," *id.* ¶ 39 (Screens 4A-4C), and finally asks them to type "their personal information (first and last name, email, phone number)" and payment information and click "Reserve Now." *Id.* ¶ 40 (Screen 5). Users respond at

each stage, equating to "users affirmatively entering, and interacting with, information on the Website[,]" which the Third Parties capture. *Id.* ¶¶ 35, 58-76. When a consumer uses Wynn's Website, she communicates with it just as she would with a Wynn hotel concierge.

As this Court held, "the names of buttons clicked on websites and their associated URLs" likely qualify as "'content[s]' [of communications] within the meaning of the statute." *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 795 (N.D. Cal. 2022). So, an interaction like clicking "the log-in buttons" to healthcare websites "are 'contents'…. because they concern the substance of a communication." *Id.* at 795-96; *see also Doe I v. Google LLC*, 2025 WL 1616720, at *3 (N.D. Cal. June 6, 2025) (clicking "'bill pay' would seem to be the content of a communication"). Even *Eating Recovery*, 806 F. Supp. 3d at 1115 n.5—a case Defendant relies on (MTD at 17-18)—notes that "clicking on the 'For Me' button under the prompt 'I am reaching out'" likely "satisf[ies] the 'contents of communication' requirement." Just as those users communicated desire to log into their patient portal, or pay their bill, Wynn's users communicate which hotel and which room they wish to stay in, on which dates they come and on which dates they leave, how many guests are with them, at what rate, and with which upgrades and add-ons. Compl. ¶¶ 3, 30.

Wynn cites a district court decision that was reversed. MTD at 19 (citing *Mikulsky v. Bloomingdale's, LLC*, 713 F. Supp. 3d 833, 845 (S.D. Cal. 2024)). In *Mikulsky*, the district court thought "products viewed or placed in website visitors' 'carts' or 'wish lists,' and 'data entered into text fields but not 'submitted' by the visitor,'" did not allege the contents of communications. 2024 WL 3091395, at *3 (S.D. Cal. May 14, 2024). The Ninth Circuit disagreed: "[t]he district court erred in dismissing Mikulsky's claim" and that the "[c]omplaint alleged real-time capture of the contents of Mikulsky's communications on Defendants' website." *Mikulsky v. Bloomingdale's LLC*, 2025 WL 1718225, *1 (9th Cir. June 20, 2025).

Nor can Wynn rely on *King v. Hard Rock Cafe Int'l (USA), Inc.*, 2025 WL 1635419, at *4-*5 (E.D. Cal. June 9, 2025). The *King* court acknowledged "'descriptive URLs that reveal specific information about a user's queries' may reflect the 'contents' of communications," (cleaned up), and granted leave to amend because the plaintiff had not "identif[ied] with specificity what information she provided on [the] [w]ebsite." *Id.* at *4. At most, *King* requires pleading which specific

communications were intercepted—an argument other courts reject. *See In re Meta Pixel Tax Filing Cases*, 724 F. Supp. 3d 987, 1004 (N.D. Cal. 2024) ("Plaintiffs do not need to plead the specific … sensitive contents of the communications they say were intercepted"); *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 139 (3rd Cir. 2015) ("this scheme, if it operated as alleged, involved the collection of at least some 'content[.]'").

**C. Plaintiff Alleges that Wynn "Aided, Agreed With, Employed, Or Conspired With" the Third Parties in Violation of the Fourth Prong of CIPA § 631(a)**

Wynn argues that "Plaintiff does not adequately plead Wynn's intent to aid or abet violations of the statute." MTD at 21 n.6. But "[t]he statute as worded does not include an intent standard." *St. Aubin*, 2024 WL 4369675, at *7. The text of the fourth clause imposes liability on one who "aids, agrees with, employs, *or* conspires with any person" to violate the statute. Cal. Penal Code § 631(a) (emphasis added). The clause is disjunctive. *Barker Bros. v. City of Los Angeles*, 10 Cal. 2d 603, 606 (1938). Wynn is liable if it did any one of those things. "The plain text of section 631(a) is unambiguous on this issue … [i]t does not require that a party aid *and* abet," and "there is no basis to read in a common law standard of aiding and abetting when the statute itself is clear." *Tate v. VITAS Healthcare Corp.*, 762 F. Supp. 3d 949, 959 (E.D. Cal. 2025). "Defendant's contention that 'aids' means 'aiding and abetting' ignores the 'agrees with, employs, or conspires with' language of the clause." *Cousin v. Sharp Healthcare*, 681 F. Supp. 3d 1117, 1130 (S.D. Cal. 2023); *accord St. Aubin*, 2024 WL 4369675, at *8; *Tenet Healthcare Corp.*, 789 F. Supp. 3d at 839.

Wynn, itself, is alleged to have "purposefully installed various tracking application programming interfaces into the code of its website[.]" Compl. ¶ 2; *see also id.* ¶¶ 41-57 (detailing how Wynn added the code). Plaintiff's allegations that Wynn configured the tracking technologies for targeted "marketing and advertising based on an analysis of the intercepted communications," (Compl. ¶ 165), without consent (*id.* ¶¶ 4, 7, 137, 140), "are sufficient to plead that [Wynn] either aided, agreed, employed, or conspired with [the Third Parties] in the alleged interception of their information and data." *Tenet*, 789 F. Supp. 3d at 839-40 (citing cases).

This Court has already held that allegations of precisely this kind suffice. In *Gabrielli*, 815 F. Supp. 3d at 870, the defendant argued, as Wynn does here, that the plaintiff "'did not plead facts

to suggest that Haleon intended to aid and abet a third party's violation of CIPA.'" This Court disagreed: the complaint "sufficiently allege[d] that Haleon intentionally operated its website and assisted third parties in gathering Gabrielli's information." *Id.* The intent standard "requir[es] only that an act be done on purpose, as opposed to being done with knowledge that it is unlawful." *Id.* (discussing *Zarif v. Hwareh.com, Inc.*, 789 F. Supp. 3d 880, 894–95 (S.D. Cal. 2025)).

### D. Plaintiff Need Not Plead The Third Parties' Intent to Collect Guest Records—And Has Alleged Sufficient Intent Regardless

Wynn's does not, and cannot, dispute that it intended share sensitive hotel guest records with the Third Parties here. It "purposefully installed [the] various tracking application programming interfaces [at issue here] into the code of its website." Compl. ¶ 2. Each of these Third-Party's tracking pixels allow website owners to select which events the website owners want them to track. *Id*. ¶ 44 (Snap), ¶¶ 47-48 (Google), and ¶¶ 52-53 (Meta). And "one by one, [Wynn] 'toggle[d] ON' [such trackers to collect users'] email, first name, last name, Phone Number," and other personally identifiable information to match those specific events to specific users. *Id*. ¶ 114 (Meta); s*ee also id.* at ¶ 46 ("through the Snap Pixel, Snap can 'match a customer e-mail or phone number back to a Snapchatter e-mail or phone number[]' and 'attribute website actions to Snapchatters.'"); ¶ 50 ("'Google Anayltics identifies an individual user based on… reporting identit[ies]… namely 'User-ID'; 'user-provided data'; 'device ID'; and 'modeling[.]''").

Wynn instead pivots to arguing that the Third Parties' "policies underscore that the Third Parties do not intend to collect sensitive or confidential information," and that Plaintiff must allege each of Snap, Google, and Meta "specifically seeks to collect 'sensitive and confidential' 'guest record' information for their own purposes." MTD at 20-21. The problem with Wynn's argument is it "goes beyond what the statute requires." *Tate*, 762 F. Supp. 3d at 959. It is "unnecessary to consider a third party's intention to collect or use data[.]" *Id.* at 955. *Ribas v. Clark*, 696 P.2d 637 (Cal. 1985) forecloses Wynn's position: the *Ribas* court "did not consider the wife's friend's intentions or the use to which they put the information they obtained," resting instead on the invasion inherent in "'simultaneous dissemination to an unannounced second auditor.'" *Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023) (quoting 38 Cal. 3d at 360–61).

Section 631(a)'s second prong reaches one who reads or learns the contents of "any message, report, or communication"—not any message of a kind the eavesdropper *hoped to receive*—and the third prong separately penalizes use "in any manner, or for any purpose." Requiring a plaintiff to also plead that the third-parties intended to receive this information would therefore "add requirements that are not present (and swallow the third prong in the process)," because a third party that never "intend[ed] to collect" the data (MTD at 21) could never be liable for using it either. *Javier*, 649 F. Supp. 3d at 900. It would also gut the fourth prong: a boilerplate vendor disclaimer would immunize every website operator from liability, however deliberately or invasively it configured its Snap, Google, or Meta pixel.

Wynn acknowledges that this Court rejected a similar argument in *Doe v. Meta Platforms, Inc.*, 690 F. Supp. 3d 1064 (N.D. Cal. 2023) concerning the same tracking technology at issue here, the Meta Pixel. MTD at 21-22. Yet Wynn's case here is even weaker. In *Doe v. Meta*, Meta was a party litigating its own state of mind, with access to its own systems and every incentive to establish it—and it *still* lost at the pleading stage. But here, Meta is a Third Party. And Third Parties are just that—they are not the Defendant, Wynn.

Wynn also asks the Court to "reconsider its prior reasoning" in light of *Doe I v. Google LLC*, 741 F. Supp. 3d 828 (N.D. Cal. 2024). MTD at 22. But even *Doe I* does not supply the rule Wynn needs. "[I]n *Doe*, 'the complaint acknowledge[d] that [the defendant] repeatedly told developers not to send personally identifiable information through use of its source code.'" *Wilson v. Google LLC*, 2025 WL 901941, at *6 (N.D. Cal. Mar. 25, 2025). Here Plaintiff's complaint contains no similar allegations that Wynn told any third parties not to collect all of the information on its Website. And even if the Third Parties' intent *was* relevant (it is not), Wynn does not contend that Snap, Google, or Meta discourage hotels from deploying conversion pixels on booking pages, or that booking-flow data is foreign to what these tools are built to capture — and its own exhibits say the opposite. *See* ECF No. 23-1 at 3 (Snap Conversion "enables Snap and its affiliates to receive data, including about actions taken on websites"); ECF No. 23-4 at 3 (Meta "Event Data" includes "visits to your sites … and purchases of your products").

Nor do the policies Wynn quotes disclaim receipt. They are conditional, not prohibitory: each

allocates the consent obligation *to Wynn*, not themselves. Snap requires that developers have secured "all necessary … consents," ECF No. 23-2 at 3; Google requires developers to "abide by an appropriate Privacy Policy," ECF No. 23-3 at 5; and Meta requires "necessary rights and permissions." ECF No. 23-4 at 3. That is risk-shifting. For example, Exhibit F requires Wynn to post "a clear and prominent notice on each webpage … stating that third parties, including Snap and its affiliates, may use cookies, web beacons and other technologies to collect or receive information from your websites, apps and elsewhere on the internet," for "advertising targeting," and to disclose "how and where users can opt out of the use of personal data for ad targeting." ECF No. 23-2 at 3.

## V. THE COMMUNICATIONS AT ISSUE ARE CONFIDENTIAL AND PLAINTIFF SUFFICIENTLY ALLEGES A VIOLATION OF CIPA § 632

Wynn argues that "Plaintiff does not and cannot plausibly allege she reasonably expected that her interactions with the Wynn website were not being 'recorded.'" MTD at 22.

Not so. Various courts, including this one, have held that certain categories of internet communications can be confidential where, as here, "the safekeeping of this sensitive information is enshrined under state and federal law." *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 783 (N.D. Cal. 2022). Citing this Court's decision, the court in *Gianne* likewise held plaintiff stated a CIPA section 632 where his hotel guest records were disclosed to "LinkedIn, Meta, [and] Snap." 2026 WL 925522, at *8. "Considering California Civil Code section 53.5(a) is designed to protect guest records from disclosure, this bolsters Plaintiff's claim that the communications are confidential." *Id*. (citing *In re Meta Pixel Healthcare*, 647 F. Supp. 3d at 799). Again, in *Mitchell*, 2024 WL 4471772, at *11, another court likewise held a plaintiff could state a Section 632 CIPA claim where she alleged her online hotel booking information was disclosed.

By its plain terms, the California guest records statute says: "Notwithstanding any other law, except as specified in this section, a[]… hotelkeeper… who offers or accepts payment for rooms… shall not disclose, produce, provide, release, transfer, disseminate, or otherwise communicate… all or any part of a guest record." Cal. Civ. Code § 53.5(a). And the statute broadly defines a "guest record" as "any record that identifies an individual guest, boarder, occupant, lodger, customer, or invitee." Cal. Civ. Code § 53.5(c). As the Court in *Gianne* noted in another factually similar case:

> Plaintiff has plausibly alleged that the communications at issue include "guest records" as defined in section 53.5. Fairmont qualifies as an owner or operator of a hotel and the Website users plausibly qualify as "guests," "customers," or "invitees." The tracked data identifies the Website users through, at minimum, their names and associated LinkedIn, Meta, or Snap accounts.

2026 WL 925522, at *8.

The same is true here. Wynn owns the Wynn and Encore hotels. And the Complaint includes numerous screenshots showing Snap, Google, and Meta, parties collected Wynn guests' check-in and check-out dates, their rooms, their number of guests, and other details about their reservations. Compl., ¶¶ 58-76. The Complaint further walks through how "defendant [e]nables the Third Parties to [*p*]*air* the [a]bove [d]ata with [u]sers' [i]dentities." *See id.* (Section heading VII) and ¶¶ 77-116. "Indeed, it is a reasonable inference from an objective perspective that a person reasonably expects details regarding where she is traveling, including the number of guests, destination, and number of rooms, would remain confined to the parties." *Gianne*, 2026 WL 925522, at *8.

None of Wynn's authorities come remotely close to suggesting otherwise. *See* MTD at 22-23. *Boulton v. Community.com, Inc.* announced no rule about internet communications generally; the plaintiff texted LL Cool JJ on "Community [,] a 'social media platform'" and she conceded that she "knew her text to LL Cool J would by nature be recorded." 2025 WL 314813, at *2 (9th Cir. Jan. 28, 2025). Plaintiff makes no such concession, and Wynn's online hotel booking reservation website is not even remotely close to a "social media platform." *Campbell v. Facebook, Inc.*, 77 F. Supp. 3d 836, 849 (N.D. Cal. 2014) likewise involved the collection of communications on the Facebook social media platform. And *Rodriguez v. Google LLC*, 2021 WL 2026726, at *7 (N.D. Cal. May 21, 2021) involved the recording over communications on various Google apps. There, the Court simply held that Plaintiffs did not plead sufficient information to show why they did not expect for those app developers to record their conversations. *See id.*

Wynn oddly even cites *Yoon v. Meta Platforms, Inc.*, 2024 WL 5264041, at *6 (N.D. Cal. Dec. 30, 2024). But Yoon actually supports *Plaintiff*'s argument. In *Yoon*, the Court held that "Plaintiffs have plausibly alleged a claim under CIPA § 632 and it passes the Rule 12(b)(6) challenge." *Id*. at *7. There, plaintiff's alleged that the Meta Pixel collected the video-viewing

information on websites like "HGTV.com, Bloomberg.com, USAToday.com, 247Sports.com, and PBS.com." *Id*. at *2. And to support their CIPA section 632, plaintiffs argued their video-viewing information was protected from disclosure by state and federal laws like the VPPA. *Id*. at *7. *Yoon* held "[t]he collected data here is therefore confidential because it allegedly reveals the exact title of the video being watched." *Id*. In light of this, the court expressly noted that a more technical "analysis under VPPA or its state analogue is unnecessary." *Id*. *Yoon* further added that "Plaintiffs' reasonable expectation of privacy is strengthened by the allegation that … Defendant made false representations and warranties that it does not collect such information." *Id*. Again the same is true here. Wynn falsely represented to consumers the information it shared with its "[m]arketing [p]artners" was "aggregated or de-identified" and "cannot reasonably be used to identify you." ECF No. 22-3 at 11.

## VI. PLAINTIFF STATES CLAIMS UNDER THE ECPA

Wynn argues that its "consent to any interceptions defeats Plaintiff's claims" and "the Wiretap Act does not provide for aiding-and-abetting liability." MTD at 23. First, Wynn's consent is irrelevant because (1) the party exemption does not reach procurement, and (2) the crime-tort exception applies. And Plaintiff does not plead aiding and abetting under the Wiretap Act; she pleads a violation of the statute's express procurement clause.

### A. Defendant Unlawfully Procured The Third Parties to Intercept the Communications at Issue

The party exemption does not extend to procurement. The Wiretap Act imposes liability on anyone who "intentionally intercepts, endeavors to intercept, or *procures any other person* to intercept or endeavor to intercept, any … electronic communication." 18 U.S.C. § 2511(1)(a) (emphasis added). The exemption Wynn invokes is narrower by its terms: "[i]t shall not be unlawful … for a person … *to intercept* a wire, oral, or electronic communication where such person is a party to the communication." § 2511(2)(d) (emphasis added). It says nothing about procuring. "[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002) (cleaned up).

Congress imposed liability on entities that procure others to intercept, § 2511(1)(a), but omitted them from the exemption, § 2511(2)(d). Plaintiff alleges precisely that procurement here. ¶¶ 163, 171.

Wynn argues that "Plaintiff cannot sustain a [Wiretap Act] claim under a procurement theory[.]" MTD at 25. Courts examining the text and legislative history hold otherwise. "The procurer of an interception has indeed engaged in a violation of § 2511(a), and may thus be sued by the person whose communication was intercepted." *Id.*; *accord Dawson v. Univ. of Phoenix*, 2026 WL 92248, at *14 (N.D. Ill. Jan. 13, 2026) ("the victim of the wiretap may sue any person or entity who engaged in the violation, including procuring interception"); *Q.J. v. PowerSchool Holdings LLC*, 2025 WL 2410472, at *6 (N.D. Ill. Aug. 20, 2025); *Boseovski v. McCloud Healthcare Clinic, Inc.*, 2020 WL 68578, at *5-6 (E.D. Cal. Jan. 7, 2020); *Lonegan v. Hasty*, 436 F. Supp. 2d 419, 427-28 (E.D.N.Y. 2006).

Wynn relies on *Nichols v. Peacehealth Networks on Demand LLC*, 2026 WL 607763. at *4 n.4 (W.D. Wash. Mar. 4, 2026), a case with very little analysis and which relied on *Peavy v. WFAA-TV, Inc.*, 221 F.3d 158, 168–69 (5th Cir. 2000). *Boseovski*, 2020 WL 68578, at *5-6 (E.D. Cal. Jan. 7, 2020) is far more instructive. *Boseovski* which rejected *Peavy* and found that "the procurement language … remains in the underlying criminal statute and the simultaneous amendment of § 2520(a) to provide for recovery against the 'person or entity' which violated of § 2511(1)(a)" such that a "defendant in this case may be held civilly liable if it violated the underlying criminal statute by way of procurement." *Id.*

Wynn's secondary-liability cases address theories Plaintiff does not advance. For instance, Wynn cites *Freeman v. DirecTV, Inc.*, 457 F.3d 1001, 1006 (9th Cir. 2006) but that case holding was limited to the "language of 18 U.S.C. §§ 2702 and 2707"— not § 2511, which Plaintiff brings her claims under. *Id.* at 1009. These provisions contain no analogue to § 2511(1)(a)'s "procures" clause.

### B. The Crime-Tort Exception to the Federal Wiretap Act's One-Party Consent Exemption Applies

Wynn's own authority (MTD at 24) asks whether the interception was undertaken to facilitate "some further impropriety," *Sussman v. ABC, Inc.*, 186 F.3d 1200, 1202 (9th Cir. 1999), and courts routinely find that a defendant's intentional disclosure of protected information to third parties

supplies exactly that. In *R.S. v. Prime Healthcare Servs., Inc.*, 2025 WL 103488, at *6 (C.D. Cal. Jan. 13, 2025) is instructive. There, the violation "stem[med] from [defendant's] intentional disclosure of the collected Private Information, which constitutes a 'further impropriety' independent and separate from [the] interception," because "the intent to disclose private information predates and is distinct from the interception itself." *Id.*; *see also E.H. & V.P. v. Lifelong Adoptions, Inc.*, 2026 WL 2138062 (E.D. Cal. July 24, 2026) ("In the terms of [the ECPA], the 'interception' was the recording of the electronic 'conversation' between E.H. and LifeLong's on its website. … LifeLong had *arranged ahead of time* to use Google's and Facebook's tracking software to secretly 'record' this interaction.") (emphasis added).

So too here: Wynn embedded the Third Parties' code in its Website before any user ever visited (Compl. ¶¶ 34, 42), so that user communications would be "duplicated and sent to the Third Parties at the same time as they are being sent to Defendant." *Id.* ¶ 42. The disclosure of guest records prohibited by § 53.5(a) is the object of that design, not a description of the interception. *See Garcia v. Truist Fin. Corp.*, 825 F. Supp. 3d 1149, 1166 (C.D. Cal. 2026) (defendant "chose to embed the LinkedIn Insight Tag" and "then disclosed" confidential information; purpose "was, at the very least, tortious"); *Gaige v. Exer Holding Co.*, 2025 WL 559719, at *5 n.5 (C.D. Cal. Jan. 30, 2025). And timing is immaterial: "[w]hether the disclosure occurs simultaneously with or shortly after the interception, [the] purpose remained the same at the time of the interception." *Prime Healthcare*, 2025 WL 103488, at *6. Thus, this situation is distinguished from the "circular" civil RICO argument advanced in *Planned Parenthood Fed'n of Am., Inc. v. Newman*, 51 F.4th 1125 (9th Cir. 2022).

Similarly, in *Smith v. Rack Room Shoes, Inc.*, 2025 WL 2210002, at *5 (N.D. Cal. Aug. 4, 2025), the online retailer's actions of having "customized and deployed" the third party code" showed its "purpose in engaging in that interception is sufficient to satisfy the crime-tort exception." Moreover, the defendant "intended to disclose its customers' personally identifiable communications—which it had promised not to collect or use—to third parties so that it could deliver targeted ads to its customers." *Id.* "Rack Room's alleged disclosure and use of Plaintiffs' personally identifiable information for advertising, in contradiction the commitments it made in its privacy policy, can plausibly constitute a further invasion of privacy beyond the act of intercepting the

information alone." *Id.* Here, Wynn played an instrumental, active role in embedding the code (*supra* § IV.C), and its Privacy Policy made various promises that Wynn failed to keep (*supra* § III.C).

That § 53.5 lacks a private right of action changes nothing. *See* MTD at 5 n.2. "[T]hat a statute does not authorize a private right of action does not mean that it cannot be used as an external legal hook." *K.L. v. Legacy Health*, 2024 WL 4794657, at *4 (D. Or. Nov. 14, 2024); *accord R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 897 (C.D. Cal. 2024).

Wynn nevertheless argues it should not be held liable under the crime-tort except because it had a profit motive. To be sure, this Court relied on this argument to deny a plaintiff's *motion for a preliminary mandatory injunction,* but expressly noted "this claim will present differently in a motion to dismiss context." *In re Meta Pixel Healthcare*, 647 F. Supp. 3d at 797.

That said, the recent trend among courts in this district has been to reject this argument. In just the last fourteen months, Judges Tigar, Illston, Corley, Martínez-Olguín, and Lin all held that "[t]he existence of an underlying financial motivation does not mean that the act lacked a criminal or a tortious purpose. That's like saying that a bank robber's purpose was not to commit a crime—it was to make money." *Riganian v. LiveRamp Holdings, Inc.*, 791 F. Supp. 3d 1075, 1091 (N.D. Cal. 2025) (Tigar, J.) (citation omitted). "Put simply, committing a tort and seeking a profit are not mutually exclusive (if anything, the latter is often the reason for the former)." *Krzyzek v. OpenX Techs., Inc.*, 817 F. Supp. 3d 857, 869 (N.D. Cal. 2026) (Illston, J.) (citation omitted); *accord Semien v. PubMatic Inc.*, 2026 WL 216333, at *10 (N.D. Cal. Jan. 27, 2026) (Illston, J.) (same). So "being primarily motivated to make money does not preclude application of the crime-tort exception." *Gilligan v. Experian Data Corp.*, 2026 WL 32259, at *3 (N.D. Cal. Jan. 6, 2026) (Lin, J.) (collecting cases); *accord Dellasala v. Samba TV, Inc.*, 2026 WL 1138358, at *10 (N.D. Cal. Apr. 21, 2026) (Corley, J.) ("even where a defendant is arguably motivated by monetary gain, the crime-tort exception may nonetheless apply…"); *Lynch v. Express Scripts Holding Co.*, No. 23-CV-01170-AMO, 2026 WL 1749550, at *5 (N.D. Cal. June 17, 2026) (Martínez-Olguín, J.) ("[W]hile the third-party interceptors presumably were only trying to make money, [defendant] itself arguably was committing the tort/crime of disclosing its customer's sensitive mental health-related information in violation of HIPAA.").

Wynn's cited cases are years older and rest the *DoubleClick* line cases that have increasingly been falling out of favor by courts in this district. *See Katz-Lacabe v. Oracle Am., Inc.*, 2024 WL 1471299, at *3 (N.D. Cal. Apr. 3, 2024) and *Rodriguez v. Google LLC*, 2021 WL 2026726, at *6 n.8 (N.D. Cal. May 21, 2021). More recent courts have "not [been] persuaded by the authorities [defendant] cites to argue financial motives cannot constitute tortious motive" *Semien*, 2026 WL 216333, at *10.

**CONCLUSION**

For the foregoing reasons, Wynn's motion to dismiss should be denied. Should the Court dismiss any claim, Plaintiff requests leave to amend.

Dated: September 14, 2026

**BURSOR & FISHER, P.A.**

By: */s/ Stefan Bogdanovich*

Stefan Bogdanovich (State Bar No. 324525)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: sbogdanovich@bursor.com

**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
50 Main Street, Suite 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656
E-mail: pfraietta@bursor.com

*Attorneys for Plaintiff*